UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| ESTATE OF JOSHUA LEVY, deceased, and SUSAN LEVY, in her personal capacity and as representative of the ESTATE of JOSHUA LEVY, and DAVID BREIDENBACH,<br><br>          Plaintiffs,<br><br>      v.<br><br>CITY OF SPOKANE, SPOKANE COUNTY, CHRIS KEHL, MICHAEL McCASLAND, SGT. YAMADA, and JOHN/JANE DOES 1-10, each in their personal and representative capacities,<br><br>          Defendants. | NO. CV-10-0233-EFS<br><br>**ORDER MEMORIALIZING THE FEBRUARY 7, 2012 ORAL RULINGS, ENTERING JUDGMENT IN DEFENDANTS' FAVOR, AND CLOSING THE FILE** |

A hearing occurred in the above-captioned matter on February 7, 2012. Plaintiff David Breidenbach was present, represented by Jeffrey Finer. Mark Leemon appeared on behalf of Plaintiffs the Estate of Joshua Levy and Susan Levy, who was present. Rocco Treppiedi appeared on behalf of Defendants City of Spokane, Officer Michael McCasland, and Sergeant Isamu Yamada ("City Defendants"); Officer McCasland and Sergeant Yamada were present. Heather Yakely appeared on behalf of Defendants Spokane County and Sheriff Deputy Chris Kehl ("County Defendants"). Before the Court were several motions: 1) Plaintiffs' Motion for Partial Summary

ORDER ~ 1

Judgment, ECF No. 48, 2) City Defendants' Motion for Summary Judgment, ECF No. 52, 3) City Defendants' Joint Motion to Strike Plaintiffs' First Supplemental Disclosures, ECF No. 54, 4) County Defendants' Joint Motion for Summary Judgment, ECF No. 60, 5) County Defendants' Joint Motion to Strike Declaration in Support of Motion, ECF No. 79, and 6) City Defendants' Joint Motion to Strike Valadez Affidavit, ECF No. 97. After reviewing the submitted material and relevant authority and hearing from counsel, the Court is fully informed. For the reasons given below and at the hearing, the Court denies the motions to strike and grants summary judgment in Defendants' favor.

**A. Facts**

   1.   <u>General Background</u>

   To give context to the three motions to strike that follow, the Court sets forth the following basic facts; more detailed facts follow the Court's analysis of the motions to strike.

   At the age of twenty-eight, Joshua Levy,[1] who had a history of mental illness, tragically died after jumping from the Monroe Street Bridge in Spokane, Washington to the rocks 150 feet below. For the preceding twenty hours, Spokane law enforcement, including Spokane Police Department (SPD) officers and Spokane County sheriff personnel, had attempted to safely remove Mr. Levy from the bridge's concrete railing through conversational coaxing. Concerned that Mr. Levy was getting fatigued and would fall, law enforcement devised a plan to have Mr. Levy

--------

   [1] At birth, Mr. Levy was named William David Breidenbach. In 2001, he changed his name to Joshua Elijah Levy.

ORDER ~ 2

step down from the railing to urinate inside the bridge's portico.  Law enforcement would then tase and secure him.  Unfortunately, when Mr. Levy stepped down onto the sidewalk to urinate, the taser barbs did not attach and the officers were unable to grab Mr. Levy before he jumped back onto the railing and then jumped to his death.  Mr. Levy's father, Mr. Breidenbach, was near the bridge and observed his son jump to his death.

    2.  <u>Motions to Strike</u>

        a.  *Plaintiff Breidenbach's First Supplemental Disclosures*

The County Defendants ask the Court to strike Mr. Breidenbach's November 17, 2011-served supplemental initial disclosures, which stated that Mr. Breidenbach sought treatment with mental-health provider Ms. Gail Reid-Gurian on November 14, 2011, for symptoms related to viewing his son jump to his death, because 1) the disclosure is untimely given that the discovery deadline passed on November 14, 2011, 2) the "supplement" is irrelevant because it is insufficient proof of the objective medical symptomatology required for Mr. Breidenbach's negligent infliction of emotional distress claim, and 3), if permitted, the "supplement" must be supported by a written expert report or summary under Federal Rule of Civil Procedure 26(a)(2).  Mr. Breidenbach opposes the motion, arguing that the disclosure is a proper Rule 26(e) supplement and submits that any prejudice to Defendants can be remedied by allowing Defendants to depose Mr. Breidenbach's medical provider.

Following the briefing of this motion, Plaintiffs filed under seal Ms. Reid-Gurian's declaration, and medical records from Mr. Breidenbach's November 14, 2011 visit with her.  ECF No. 140.  Ms. Reid-Gurian ///

diagnosed Mr. Breidenbach as suffering from post-traumatic stress disorder as a result of observing his son jump to his death.

Plaintiffs' late discovery disclosures clearly violate the Court's Scheduling Order.  Although Plaintiffs attempt to characterize these disclosures as initial-disclosure supplements under Federal Rule of Civil Procedure 26(e), this was the first documentation that Defendants received advising that Mr. Breidenbach had sought medical assistance for his emotional distress and that Mr. Breidenbach had been diagnosed with post-traumatic stress disorder.  Nonetheless, the Court will not strike these late disclosures.  Defendants were aware that Mr. Breidenbach observed his son jump from the bridge; it is expected that Mr. Breidenbach would seek medical treatment or counseling for this tragic experience.  To alleviate prejudice to Defendants resulting from this late disclosure, Defendants are permitted, if necessary, to depose Ms. Reid-Gurian and retain an expert to challenge her opinions.  Accordingly, the County Defendants' motion to strike is denied.

        b.   *Exhibit A to Ms. Slattery's Declaration*

The County Defendants ask the Court to strike the KREM video, which is Exhibit A to the Declaration of Jennifer Slattery, ECF No. 49, because it is not authenticated, is hearsay, is irrelevant, and the probative value, if any, is substantially outweighed by the risk of undue prejudice.  ECF No. 79.  The Court declines to strike the video.

///
///
//
/

ORDER ~ 4

On January 4, 2012, Plaintiffs submitted an untimely[2] declaration from KREM-2 News Executive News Director Noah Cooper, which states that the video was recorded by a KREM news photographer on assignment, and to the best of his knowledge the video is an unaltered, accurate depiction of events shown therein, which are Mr. Levy's last moments on the bridge, including his coming off of the railing to urinate, standing on the sidewalk, and then jumping back onto the railing followed by jumping off the bridge.  ECF No. 111.  In September 2007, Mr. Finer downloaded the video from the KREM news website, and Exhibit 79 is a copy of this downloaded video, which was disclosed to Defendants during initial disclosures.  ECF No. 103 ¶¶ 2, 3, & 4.  Plaintiffs acknowledge that the KREM photographer was at a considerable distance, the angle from which the video was shot caused vegetation and buildings located in the distance to appear much closer, and the video condenses the frames.

Notwithstanding these deficiencies, the Court considers the video for the purpose requested by Plaintiffs: to consider where Mr. Levy was in relation to the portico, and the sequence of his and the officers' movements.  *See Scott v. Harris*, 550 U.S. 372, 379, n.5 (2007) (noting that the video of the vehicle chase was considered by the Supreme Court in its analysis of whether the officers' conduct was reasonable).  Although the Court must determine whether law enforcement acted

---

[2]  Mr. Finer possessed the video since 2007.  He should have reasonably anticipated that Defendants would challenge its authenticity.  In the future, Mr. Finer is encouraged to anticipate such challenges and to timely provide authenticating declarations.

ORDER ~ 5

reasonably under the circumstances by focusing on the perspective of a reasonable officer at the scene, *see Graham v. Connor*, 490 U.S. 386, 397 (1989), the Court defines the facts in Plaintiffs' favor when analyzing whether the individual Defendants are entitled to qualified immunity, *see Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986) (requiring the court when analyzing a summary-judgment motion to believe the non-movant's facts).   Accordingly, the Court can consider the last actions of Mr. Levy and the officers from a line of sight different than that of the individual Defendants.   The Court also finds the video's relevance is not substantially outweighed by its prejudice.   In addition, the Court finds the video is authentic, Fed. R. Evid. 901, and is a non-hearsay record of an event, Fed. R. Evid. 803(6) & 807.

   For these reasons, the Court denies the County Defendants' motion to strike.

### c.   *Larry Valadez Affidavit*

   Finally, the City Defendants ask the Court to strike Larry Valadez's affidavit, ECF No. 82, because 1) the information and pictures contained therein were disclosed after the discovery cutoff, 2) Mr. Valadez was not identified as a witness for Plaintiffs, 3) Mr. Valadez has not been identified as an expert nor was an expert report provided by Plaintiffs, and 4) the exhibits attached to Mr. Valadez's affidavit a) are not authenticated, b) are irrelevant, and c) are inadmissible because their probative value, if any, is substantially outweighed by the risk of undue prejudice.

   Plaintiffs hired Mr. Valadez to review the KREM video and compare Mr. Levy's last movements and location on the video with those proffered

by law enforcement during their depositions and in declarations: specifically, to challenge Sergeant Kehl's statement that Mr. Levy was inside of the portico when Sergeant Kehl gave the signal to Officer McCasland to deploy the taser.  Because Plaintiffs were unaware until the depositions and declarations that law enforcement would contend that Mr. Levy was inside the portico, Plaintiffs did not earlier retain Mr. Valadez's services.  Plaintiffs' counsel should have, however, advised defense counsel promptly after the law enforcement officers' depositions that Plaintiffs would be obtaining Mr. Valadez's services, rather than wait until the declaration's filing on December 9, 2011.

Notwithstanding Plaintiffs' counsel's failure to timely notify Defendants, the Court considers Mr. Valadez's affidavit and its attachments.  These documents are helpful to understand Plaintiffs' assertion of where Mr. Levy was located in relation to the portico, the portico layout, and the officers' positions in those final moments.  To alleviate any prejudice to Defendants, the Court will, if necessary, permit Defendants to depose Mr. Valadez and retain their own expert to challenge Mr. Valadez's opinions.[3]  Accordingly, the City Defendants' motion to strike is denied.

///

///

//

/

_____

[3]  Defendants submitted a declaration of Michael Schott, a forensic video analyst, to contest Mr. Valadez's affidavit.  ECF No. 137.

ORDER ~ 7

    3.  Detailed Facts[4]

    Mr. Levy was the son of Mr. Breidenbach and Ms. Levy.  Mr. Levy struggled with paranoid delusions, had been diagnosed as psychotic, and had been involuntarily committed to mental health treatment facilities several times.  Mr. Levy's first psychiatric admission occurred in August 2000 after he administered self-inflicted knife wounds.  Thereafter, Mr. Levy was involuntarily hospitalized on the following dates: 1) June 14, 2003 (drove vehicle into a tree at a high rate of speed and then jumped off a bridge into the Puget Sound), 2) November 7, 2003 (cut his wrists, arms, and neck with razor blades), 3) February 22, 2005 (climbed to the top of his mother's Bainbridge Island home and refused to come down), 4) August 31, 2006 (jumped from the Bainbridge Island Agate Pass Bridge), 5) January 12, 2007 (coaxed safely down from the Agate Pass Bridge after 120 minutes), 6) March 9, 2007 (lunged in front of moving vehicles), 7) April 22, 2007 (drove a vehicle at a high rate of speed into the side of a Wal-Mart), 8) May 13, 2007 (pulled back to safety by law enforcement after attempting to jump from Agate Pass Bridge), and 9) July 26, 2007 (jumped in front of semi-truck in Spokane).

    Mr. Levy was detained either for mental health evaluations or in inpatient care for 232 of the 326 days before his death.  On July 24,

_____

    [4]  In connection with their motions, the parties submitted a Joint Statement of Uncontroverted Facts.  ECF No. 110.  The Court treats these facts as established consistent with Federal Rule of Civil Procedure 56(d), and sets these forth in this "Factual Background" section without reference to an ECF number.

2007, following a two-month hospitalization at Western State Hospital for his May 13, 2007-suicide attempt, Mr. Levy was discharged by order of the Pierce County Superior Court, placed on very high doses of anti-psychotic medication, and released to his father's care. Mr. Breidenbach drove him to Spokane to stay with him.

Although Mr. Levy's court-authorized discharge plan required him to present to Spokane Mental Health upon his arrival in Spokane to register for treatment, Mr. Levy did not do so. Rather, Mr. Levy disappeared from his father's residence in the early hours of July 26, 2007.

At approximately 7:00 p.m. that evening, several concerned citizens called SPD via 9-1-1 to advise that a man was sitting on the southern portion of the Monroe Street Bridge's east-side concrete railing with his legs hanging over the railing toward the rocks below and that it looked like he was contemplating suicide. SPD officers arrived within a few minutes of the 9-1-1 calls and observed Mr. Levy sitting on the bridge's railing near the portico. The bridge includes a roadway and a sidewalk; there is a waist-high concrete barrier between the roadway and sidewalk ("inner barrier") and a separate waist-high concrete railing at the bridge's sidewalk edge. A portion of the bridge's sidewalk is a portico, or gazebo. Mr. Levy was located outside of this portico on the outer railing—approximately 130 feet above the rocks. The bridge spans the Spokane River; however, Mr. Levy was above the river's rocky shore.

Mr. Levy was not observed to have a weapon. The officers secured the bridge from both the north and south entrances and requested that a dive team and emergency medical personnel be staged near the command post on the bridge. When the officers were unsuccessful in persuading Mr.

Levy to move to a safer position, they requested trained crisis negotiators from the City's Hostage Negotiations Team (HNT),[5] who responded and began attempting to persuade Mr. Levy to talk with them and move to a position of safety.

Mr. Levy was largely unresponsive to the officers' verbal contacts, and any movement by law enforcement disturbed him. Therefore, the negotiations focused on keeping him calm. Initial information provided by Mr. Levy was misleading. Finally, when officers used the name of a runaway from a group home whom officers believed he might be, Mr. Levy threw a credit card toward them that had his name.

Negotiators contacted Spokane Mental Health officials, who related that they had no history on Joshua Levy. Negotiators eventually determined that Mr. Levy was from the western side of the state. Negotiators thereafter made calls to western Washington law enforcement and mental health officials. A contacted police negotiator in western Washington, David Shurick, related that he was familiar with Mr. Levy and advised that Mr. Levy was diagnosed with paranoid/delusional-type mental illness. Officer Shurick spoke with SPD Officer Sandra McIntyre and advised that Mr. Levy had attempted to commit suicide on a number of occasions, at least two of which involved jumping off bridges. SPD learned that in one of the bridge incidents Mr. Levy reportedly attempted to pull a responding officer over the side of a bridge as the officer

---

[5] HNT consists of approximately ten SPD officers who are specifically trained in crisis negotiations. HNT trains together one day each month and is dispatched as a team to crisis situations.

attempted to help Mr. Levy get to safety; the documentation to this incident, however, indicates that Mr. Levy was trying to free himself from the officer's grip.  Officer Shurick's reported information about Mr. Levy's prior suicide attempts caused the officers to take extra precautions for their own safety.

During the night, Mr. Levy largely refused to engage in conversation and was unresponsive to questions and scenarios posed by the negotiators. But negotiators were able to "trade" water, Gatorade, and cigarettes in exchange for Mr. Levy pulling his legs back to a more secure area on the portico's buttress.  Mr. Levy was still skittish and hyper-vigilant about the officers' proximity to him.

Officer McIntyre observed a bicycle on the bridge.  The officers discussed the bicycle with Mr. Levy.  Mr. Levy told Officer McIntyre to "take the bike to 212 N. Division," but provided no further information. Officers eventually learned that this was Mr. Levy's father's bicycle business.  Because it is common for people intending to commit suicide to put their affairs in order before doing so, this raised the officers' concern that Mr. Levy may jump.  And as the sun rose on July 27, 2007, Mr. Levy told an officer to tell Mr. Levy's father "goodbye."

Later that morning Spokane Mental Health Professional Shelby Whitworth arrived at the bridge and met with HNT.  She exchanged the information that she obtained about Mr. Levy, and HNT provided her with the information they had gleaned during the night, including their own observations of Mr. Levy.  After leaving contact information, Ms. Whitworth returned to her office to prepare the necessary documentation to have Mr. Levy involuntarily committed for psychological evaluation

once he was in police custody.  It is Spokane Mental Health's policy that its employees not approach any individual at a crisis scene for mental health treatment until the person is secured; consistent with this policy, Ms. Whitworth did not speak with Mr. Levy.

As negotiators continued trying to gain Mr. Levy's cooperation, they were advised by Stephen Magee, an on-call mental health worker from the Bainbridge Island area, that Mr. Levy had been in Western State Hospital on a "mental hold," prior to his release on July 23, 2007.  Negotiators also learned the identity of Mr. Levy's mother, Ms. Levy.  She was contacted at approximately 6:30 a.m. on July 27, 2007.  Ms. Levy confirmed that Mr. Levy suffered from paranoid delusions and was probably not taking his medication.  She informed the officers that Mr. Levy had moved to the Spokane area two days earlier to live with his father.

Negotiators then contacted Mr. Breidenbach by telephone.  Mr. Breidenbach drove to the scene at about 7:00 a.m. and was interviewed by Officer McIntyre.  Mr. Breidenbach related that Mr. Levy had not returned home the day before and he did not know what type of medication Mr. Levy was supposed to be taking.  During the morning, Mr. Breidenbach was approached by SPD Chief Anne Kirkpatrick and other officers to express that law enforcement was doing what they could and that they were utilizing a "hands off" approach.

Because HNT had been on the scene through the night, at approximately 9:40 a.m., SPD Captain Steve Braun told the incident commander, Lieutenant Darryl Toombs, that he wanted HNT replaced by the Spokane County Sheriff's Office, if possible.  Lieutenant Toombs contacted the Spokane County Sheriff's Office, and it was agreed that the

Sheriff's Office Crisis/Hostage Team would relieve HNT.  This transition began at approximately 11:00 a.m.  Members of the two teams met in the City's HNT van on the bridge so that HNT could share its information about Mr. Levy, including his mental health history, the officers' observations and what had occurred thus far.  Lieutenant Judith Carl related the basic "hands off" tactical plan they had in place overnight. She also discussed the contingencies of utilizing physical force, including use of non-lethal devices such as a taser should Mr. Levy become mobile.

Sergeant Kehl took lead responsibility for the negotiations to be engaged in by Deputies Russell Dowdy and Don Blashill, and supervised a team of Spokane County deputies just north of Mr. Levy.  SPD Sergeant Isamu Yamada served as lead officer for the City and managed the rotation of the law enforcement officers on the south side of the bridge.

Sheriff Deputies Dowdy and Blashill introduced themselves to Mr. Levy, who was standing on the buttress with his back on the portico's column, and negotiations continued.  They asked him about mountain biking, rafting, and a number of other subjects; Mr. Levy did not engage in conversation.  They also offered Mr. Levy options to come down such as Deputy Dowdy driving his personal truck onto the bridge so that Mr. Levy could leave in a non-police vehicle and "save face."  The deputies observed that Mr. Levy appeared fatigued, noting in the Sheriff's Office's detailed time log at 1:34 p.m. that Mr. Levy looked sleepy.  Mr. Levy would intermittently scoot out toward the edge and begin breathing deeply while looking down.  It appeared to the deputies that Mr. Levy was summoning the courage to jump.  However, eventually, Deputy Dowdy was

ORDER ~ 13

successful at getting Mr. Levy to sit rather than stand and then later rolled a bottle of water near him.  After rolling the water bottle toward Mr. Levy, Deputy Dowdy stayed on the sidewalk.  By noon, the temperature was already approximately 95 degrees.  ECF No. 93-1 ¶ 8.

The deputies communicated their progress, or lack thereof, and concerns to Sergeant Kehl and Lieutenant Toombs.  A plan to use a taser to immobilize Mr. Levy if he got down from the railing to urinate was discussed.  Lieutenant Toombs approved a two-step "hands on" intervention if Mr. Levy stepped down from the railing: 1) an officer would raise and tase Mr. Levy, who would be inside the portico, through the portico's open roadside window, and 2) officers would rush the immobilized Mr. Levy and secure him.  Lieutenant Toombs understood that Mr. Levy would be in the portico when he was tased.  Details of who was to perform what tasks were left to the officers.

Sergeant Kehl informed the County Team of the plan.  Sergeant Kehl's role was to give a signal to SPD Officer McCasland when Mr. Levy was in the portico.  Officer McCasland, a then-six-year SPD officer with twenty-two years of military experience, was to be stationed at the portico's open roadside window.  Once given the signal by Sergeant Kehl, Officer McCasland, who was trained and qualified to use a taser, was to rise and deploy the taser through the open window on Mr. Levy, who would be approximately ten to fifteen feet away inside the portico.  Officer McCasland, who had not used a taser in the field, did not have a taser with him, and so he borrowed Officer Douglas' taser, which was a different model than his own. Deputy Dowdy's role was to keep Mr. Levy's attention focused on him in the north so that SPD Sergeant Yamada and

Officer Traci Douglas, who would hide behind the portico's southwest corner, could rush Mr. Levy from the south once given the signal by Sergeant Kehl.  Sergeant Kehl and Deputy Hixson would rush Mr. Levy once the taser was deployed.  There was no discussion of a back-up plan or abort signal if Mr. Levy did not enter the portico, or the taser and rush did not work as planned.

At approximately 2:25 p.m., Lieutenant Toombs informed Mr. Breidenbach that he may see some action on the bridge.  Mr. Breidenbach was not told that the officers planned to use a "hands on" approach to secure Mr. Levy.

Thereafter, Mr. Levy indicated to Deputy Dowdy that he needed to urinate.  Deputy Dowdy suggested to Mr. Levy that he come off the railing to urinate, asking "[d]o you really want to urinate right here? Why don't you step down where it's private, and you can go ahead and urinate?" Just before 3:30 p.m., Mr. Levy got down off the railing to urinate.  It is disputed whether Mr. Levy entered the portico; the KREM video shows Mr. Levy was at the portico's threshold when he began urinating. Nonetheless, Sergeant Kehl gave Officer McCasland the signal to deploy the taser; Officer McCasland, who had a clear, within-range view of Mr. Levy through the portico's roadside window, fired the taser.  The taser's deployment was unsuccessful because one or both of the prongs missed Mr. Levy, and he jumped back up onto the railing.  Mr. Levy paused, looked at the rushing officers, and then jumped off the bridge when two officers arrived on the sidewalk near his prior location.

///

//

1    Mr. Breidenbach, watching from a viewpoint off of the bridge, saw
2    his son go down to the sidewalk, jump back onto the railing, and then
3    jump to his death.

4    On August 1, 2007, Chief Kirkpatrick, Spokane County Sheriff Ozzie
5    Knezovich, and other officers from both agencies met to debrief the
6    operation, consistent with the municipalities' policy of debriefing after
7    a crisis situation.   SPD Captain Steven Braun prepared a two-page
8    document summarizing the meeting; this document does not identify a
9    violation of a City or County policy or procedure.

10   On July 26, 2010, Plaintiffs filed this lawsuit.   ECF No. 1.
11   Through 42 U.S.C. § 1983 claims, Mr. Levy's estate asserts a violation
12   of Mr. Levy's Fourth Amendment right to be free from excessive force and
13   his parents assert a violation of their Fourteenth Amendment due process
14   rights.   ECF No. 26.   Mr. Breidenbach also claims negligent infliction
15   of emotional distress.   *Id.*

16   All parties filed summary-judgment motions.   Plaintiffs seek summary
17   judgment in their favor on 1) Mr. Levy's excessive force § 1983 claim and
18   2) Mr. Breidenbach's negligent infliction of emotional distress claim.
19   ECF Nos. 48 & 72.   The City Defendants and County Defendants both seek
20   entry of judgment in their favor on all claims.   ECF Nos. 52 & 60.

21   **B.   Standard**

22   Summary judgment is appropriate if the record establishes "no
23   genuine issue as to any material fact and the movant is entitled to
24   judgment as a matter of law." Fed. R. Civ. P. 56(a).   The party opposing
25   summary judgment must point to specific facts establishing a genuine
26   issue of material fact for trial.   *Celotex Corp. v. Catrett*, 477 U.S.

317, 324 (1986); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986).  If the non-moving party fails to make such a showing for any of the elements essential to its case for which it bears the burden of proof, the trial court should grant the summary judgment motion.  *Celotex Corp.*, 477 U.S. at 322.

**C.   Authority and Analysis**

1.   <u>Mr. Levy's § 1983 Claims Against the Individual Defendants</u>

Plaintiffs claim the officers' headlong rush toward Mr. Levy, when he was not confined in the portico or tased, was an application of deadly force without legal justification.  Defendants oppose Plaintiffs' motion contending 1) they did not violate Mr. Levy's Fourth Amendment right to be free from excessive force, and 2) Mr. Levy's claimed right was not clearly established on July 27, 2007.  The individual Defendants maintain they are entitled to qualified immunity.

Section 1983 provides a cause of action against persons acting under color of state law who have violated rights guaranteed by the U.S. Constitution or federal statutes.  42 U.S.C. § 1983[6]; *Buckley v. City of*

---

[6] Section  1983 provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

42 U.S.C. § 1983.

ORDER ~ 17

*Redding*, 66 F.3d 188, 190 (9th Cir. 1995).  Here, there is no disagreement that each of the officers acted under color of state law. The focus is instead on whether Defendants violated Mr. Levy's Fourth Amendment right to be free from excessive force and whether this right was clearly established at the time of the alleged misconduct: these are referred to as the *Saucier* elements.  *Pearson v. Callahan*, 129 S. Ct. 808, 818 (2009) (ruling that either of these elements may be analyzed first); *Saucier v. Katz*, 533 U.S. 194, 201 (2001).  An officer is protected from § 1983 liability, i.e., he is entitled to qualified immunity, if he shows his "conduct does not violate clearly established statutory or Constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).

a.  *Clearly-established right*

Understanding that the Court can begin with either of the *Saucier* elements, *see Pearson*, 129 S. Ct. at 818, the Court begins with the second element: whether a suicidal individual's right to be free from excessive force was clearly established at the time of the officers' alleged misconduct.  The Court finds that it was, even without considering the two recent cases that Defendants ask the Court not to rely on: *Bryan v. MacPherson*, 630 F.3d 805 (9th Cir. 2010), and *Glenn v. Wash. Cnty.*, No. 10-35636, 2011 WL 6760348, *5 (9th Cir. Dec. 27, 2011).

The Court agrees with Defendants that these recent cases should not be considered to determine whether the particular right at issue here was clearly established because it would be unfair to require the Defendants to abide by the holdings of these post-incident cases.  Nonetheless, pre-

July 2007 case law clearly established that law enforcement could not use more force than necessary to safely secure a suicidal individual, and deadly force was not an option if the suicidal individual was not a harm to others.

> Since 2001, it has been the law in the Ninth Circuit that
>
> Even when an emotionally disturbed individual is "acting out" and inviting officers to use deadly force to subdue him, the governmental interest in using such force is diminished by the fact that the officers are confronted, not with a person who has committed a serious crime against others, but with a mentally ill individual.  We do not adopt a per se rule establishing two different classifications of suspects: mentally disabled persons and serious criminals. Instead, we emphasize that where it is or should be apparent to the officers that the individual involved is emotionally disturbed, that is a factor that must be considered in determining, under *Graham*, the reasonableness of the force employed.

*Deorle*, 272 F.3d at 1282-83.  Although *Deorle* analyzed the use of deadly force against a suicidal individual, a reasonable officer in 2007 would have understood that, although he could employ non-deadly force to secure a suicidal individual, *see* RCW 9A.16.020(6); *Washington v. Jarvis*, 160 Wn. App. 111, 121-22 (2011), he may not employ more force than was reasonably necessary to secure that individual if the individual was not a danger to others.  *See Hope v. Pelzer*, 536 U.S. 730, 741 (2002) ("[O]fficials can still be on notice that their conduct violates established law even in novel factual circumstances. . . .."); *Deorle*, 272 F.3d at 1285-86 ("[N]otwithstanding the absence of direct precedent, the law may be, as it was here, clearly established.").  Therefore, the Court concludes the law on July 27, 2007, clearly established that the officers could not utilize more force than was reasonably necessary to secure Mr. Levy, and deadly force was not an option.

ORDER ~ 19

   b.   *Objectively reasonable*

   The Court now assesses whether the officers acted objectively reasonably under the totality of the circumstances. *See Graham*, 490 U.S. at 397.  This requires the Court to carefully balance "'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake." *Id.* at 396 (quoting *Tennessee v. Garner*, 471 U.S. 1, 8 (1985)).  This balancing test involves three analytical steps:  1) assessing the extent and nature of law enforcement's intrusion on the individual's Fourth Amendment rights, 2) evaluating law enforcement's interest in using force, and 3) balancing the intrusion on the individual with law enforcement's need for the force used.  *Glenn*, 2011 WL 6760348 at *5; *Miller v. Clark Cnty.*, 340 F.3d 959, 964 (9th Cir. 2003).  The final balancing step is performed without hindsight and focuses on the perspective of a reasonable officer at the scene to allow "for the fact that police officers are often forced to make split-second judgments — in circumstances that are tense, uncertain, and rapidly evolving — about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 397.  Although law enforcement enjoys a "perspective" inference, the circumstances are defined by the facts most favorable to Plaintiffs.  *See Anderson*, 477 U.S. at 255.

///
///
///
//
/

ORDER ~ 20

i.   Force Applied

Here, no physical force was applied.  Although Officer McCasland attempted to tase Mr. Levy[7] and other law enforcement officers attempted to grab him, neither of these attempts were successful.

Yet, force was still applied, ranging from the force of persuasion/coaxing for twenty hours, the ploy of getting him down from the railing to urinate, and the unsuccessful tasing and rush attempts.

Although a rush by law enforcement with no guns drawn and no yelling may not be considered force, because Mr. Levy was known to jump from bridges, had shown a desire to do so, and was wary of any and all police movement, this rush constituted force under the circumstances. Plaintiffs submit that this rush, without the deployment of a taser, constituted deadly force.  However, under the circumstances, the rush cannot be considered in a vacuum; rather, it must be considered in light of the entire plan developed by law enforcement in hopes of safely removing Mr. Levy from the railing and securing him.  As developed, the rush portion of the plan was not anticipated to be deadly force but rather intermediate force following the application of significant force (the taser).  Accordingly, because the officers initiated their rush before

///

---

[7]  Although tasing is a significant amount of force, *see Bryan v. MacPherson*, 630 F.3d 805, 826 (9th Cir. 2010) (using a taser in "dart-mode" is an "intermediate, significant level of force that must be justified by the governmental interest involved"), it is undisputed that this force was not used.

they were aware that the taser's deployment was ineffective, the rush is not considered deadly force.

### ii.  Law enforcement's interest

Second, the Court assesses law enforcement's interest in the use of force under the totality of the circumstances, including 1) the situation's severity, 2) whether Mr. Levy posed an immediate threat to others, 3) whether Mr. Levy resisted law enforcement's contact, and 4) whether Mr. Levy was mentally ill.  *Glenn*, 2011 WL 6760348 at *6; *Graham*, 490 U.S. at 396 (citing *Garner*, 471 U.S. at 8-9).

It is undisputed that Mr. Levy was mentally ill and largely resisted law enforcement's contact.  The situation was severe both in its nature and duration.  And given the information that they had received from Officer Shurick, the officers were concerned that Mr. Levy would pose a risk to an officer if he tried to grab Mr. Levy.

Law enforcement also had an interest in getting Mr. Levy safely down sooner rather than later.  Although reopening the bridge to traffic and using police time and resources in other ways are considerations generally given little weight, they are considerations nonetheless, especially after twenty hours.

Also, law enforcement had to consider the consequences of contining their hands-off approach.  Law enforcement was aware that Mr. Levy had jumped at least twice from a bridge in an attempt to commit suicide, and they were aware that if Mr. Levy jumped from the Monroe Street Bridge, death was certain because he was located over rocks.  The continued use of a hands-off plan concerned law enforcement because Mr. Levy, who had been on the bridge for twenty hours, was showing fatigue, thereby

ORDER ~ 22

1  increasing the odds that he would unintentionally fall off the bridge.
2  In addition, law enforcement considered the summer heat that Mr. Levy was
3  experiencing in pants and a long-sleeve shirt.

4                    iii. Balancing

5      The Court is cognizant that excessive-force inquiries "nearly always
6  require[] a jury to sift through disputed factual contentions, and to
7  draw inferences therefrom," and therefore summary judgment should be
8  granted sparingly. *Glenn*, 2011 WL 6760348 at *5 (quoting *Smith v. City
9  of Hemet*, 394 F.3d 689, 701 (9th Cir. 2005)). And the Court recognizes
10 that it must assume for purposes of the qualified-immunity analysis that
11 Officer Kehl signaled to Officer McCasland to deploy the taser before Mr.
12 Levy was inside the portico. Nonetheless, the Court finds the individual
13 officers are entitled to qualified immunity.

14     Law enforcement was faced with an extremely delicate situation.
15 They were confronted with a young man with a serious mental illness who
16 had previously attempted suicide on numerous occasions, including by
17 jumping off bridges. Law enforcement's attempts to persuade Mr. Levy to
18 come off the railing and secure him had been unsuccessful for twenty
19 hours. It was a hot summer day, and Mr. Levy was showing signs of
20 fatigue.

21     It is undisputed that law enforcement's devised two-step tase/rush
22 plan was reasonable. The plan was not executed as expected because the
23 taser barbs did not attach to Mr. Levy. Plaintiffs emphasize that Mr.
24 Levy was not in the portico when Sergeant Kehl gave the signal to deploy
25 the taser. However, even assuming that Mr. Levy was near or just outside
26 the portico's entrance as the KREM video indicates, an officer in

Sergeant Kehl's vantage point north of the portico, reasonably believed Mr. Levy was located in an area of the portico consistent with the two-step tase/rush plan. Further, it is undisputed that Officer McCasland, a seasoned officer, had a clear visual of Mr. Levy, who was within the taser's range. Plaintiffs also emphasize that Officer McCasland had not deployed a taser in the field and used a borrowed taser. However, an officer is often required to confront new situations and should not be discouraged from stepping up if trained in that area; it is undisputed that Officer McCasland was trained to deploy a taser. Therefore, under the circumstances, it was reasonable for Sergeant Kehl to signal to Officer McCasland to deploy the taser and for Officer McCasland to do so.

The "what ifs" of how this tragic incident might have gone differently if the taser had properly deployed are numerous, and probably run in the officers, onlookers, and Mr. Levy's family and friends' minds. However, as the Supreme Court recognized in *Graham*, law enforcement is often confronted with "tense, uncertain, and rapidly evolving" situations wherein they are forced to make "split-second judgments." 490 U.S. at 397. The officers faced that type of situation when the taser did not deploy. In the split-second that the officers realized that the taser had not immobilized Mr. Levy, they reacted by continuing and/or initiating a rush toward Mr. Levy. Any reasonable officer would believe this reaction constituted a reasonable use of force under the circumstances.

The officers' two-step plan and reactions when the taser was not successfully deployed were not simply a "desire to resolve quickly a potentially dangerous situation." *Deorle,* 272 F.3d at 1281. Rather, the

officers' plan and reactions were reasonably done with the goal of safely resolving an extended crisis.  That the situation ended tragically does not alter the conclusion that a reasonable officer would believe that the actions toward Mr. Levy did not constitute excessive force under the totality of the circumstances.  The individual Defendants are therefore entitled to qualified immunity.

2.   Parents' § 1983 Claim against the Individual Defendants

Ms. Levy and Mr. Breidenbach assert that their Fourteenth Amendment due process rights were violated.  Because this claim is based on the argument that the officers utilized excessive force against Mr. Levy, and the Court finds the individual Defendants are entitled to qualified immunity, the Court grants the individual Defendants summary judgment on this claim.

3.   Section 1983 Claims Against the Municipalities

Plaintiffs also assert § 1983 claims against the City and County.  During summary judgment, Plaintiffs clarified that these claims are based on the argument that the municipalities ratified the officers' alleged unconstitutional conduct.   The City and County are granted summary judgment on this claim because 1) the officers are entitled to qualified immunity for their actions and 2) there is insufficient evidence that the City or County ratified the officers' conduct.

A municipality may be held liable for an officer's unconstitutional conduct under the theory of ratification if an "authorized policymaker[] approve[s] a subordinate's decision and the basis for it." *Christie v. Iopa*, 176 F.3d 1231, 1239 (9th Cir. 1999) (quoting *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988)).   This burden requires the

1  plaintiff to show more than that the municipality 1) failed to

2  investigate an incident, 2) failed take punitive action against the

3  alleged wrongdoer, or 3) accepted the officer's version over the victim's

4  differing version. *Peterson v. City of Forth Worth, Tex.*, 588 F.3d 838,

5  848 (5th Cir. 2009); *Baskin v. City of Des Plaines*, 138 F.3d 701, 705

6  (7th Cir. 1998).

7      Here, the debriefing memorandum relied on by Plaintiffs to support

8  their claim that the City and County ratified the officers' alleged

9  misconduct states in pertinent part:

> During the later stages of negotiations it was determined that
> Levy was getting very tired and that there was a growing
> concern that he could fall asleep and fall from the bridge.
> It was decided that if Levy could be talked into coming off the
> railing and onto the sidewalk he would be physically subdued
> and controlled. Based on prior history it was determined that
> when Levy got on the sidewalk, *near the entrance to the
> portico*, he would be taken down with the application of a taser
> and physically subdued. This plan was approved by Lt. Toombs
> and was relayed to Captain Braun. The plan was attempted when
> Mr. Levy was *at the portico*. Officer McCasland did fire his
> taser but did not make contact with both darts. Without
> contact with both darts the taser was ineffective. Mr. Levy
> was able to climb back onto the railing and did jump from the
> bridge at 1527 hours.

18  ECF No. 88-1, Ex. T (emphasis added). Notwithstanding the deviation

19  between the law enforcement officers' testimony regarding the plan on the

20  date of incident, i.e., that Mr. Levy was to be inside the portico when

21  he was tased, and this debriefing memorandum, i.e., "near the entrance

22  to the portico," Plaintiffs failed to present any evidence that the

23  municipalities' standard debriefing, which they hold after a major

24  incident, is an "approval" of any alleged conduct or inaction by the

25  officers and deputies. *See Brown v. City of Milwaukee*, 288 F. Supp. 2d

26  962, 982 (E.D. Wis. 2003) (finding the city's failure to require formal

reports to be filed after employing the sensory overload tactic did not constitute ratification of every use).   Plaintiffs offered no evidence to contest Sheriff Knezovich's statement that a debriefing "is a learning tool and it is done regularly following any sort of incident involving special teams.   It is not intended to investigate potential policy violations or citizen right's violations."   ECF No. 91, Ex. XX ¶ 7.   SPD Captain Braun similarly recognized that the standard debriefing looked into how the departments responded, whether resources were available, and whether devices functioned properly, stating, "[t]he debriefing was not designed to review any alleged impropriety against any officer.   Any allegation of misconduct, such as use of excessive force, would be investigated by SPD Internal Affairs Unit, and would involve a much different process then the one utilized for the debriefing." *Id*. Ex. ZZ ¶ 4.

Accordingly, the Court finds Plaintiffs failed to present sufficient evidence to establish a triable issue of fact as to whether the municipalities ratified the officers' conduct.   The City and County are granted summary judgment on this claim.

### 4.   Negligent Infliction of Emotional Distress

Mr. Breidenbach alleges a claim of negligent infliction of emotional distress (NIED), contending that SPD Chief Kirkpatrick and other officers assured him that law enforcement would only use a hands-off, self-surrender policy and therefore law enforcement had a duty not to engage in physical force toward Mr. Levy, a duty they breached.   The Court finds that law enforcement did not owe Mr. Breidenbach a duty to continue a specific course of police tactic toward Mr. Levy.   Rather, the duty, that

law enforcement owed Mr. Breidenbach, if any, was to comply with Mr. Levy's Fourth Amendment rights. Because a reasonable officer would have believed his conduct toward Mr. Levy on July 27, 2007, was permitted by the Fourth Amendment, the individual Defendants did not breach any duty owed to Mr. Breidenbach. Likewise, because the officers' actions were reasonable, they are exempted from liability under RCW 71.05.120(1) (exempting a peace officer from responsibility if he in good faith and without gross negligence detains an individual with mental health issues).

The documentation from Mr. Breidenbach's November 14, 2011-visit with Ms. Reid-Gurian indicates that Mr. Breidenbach suffers post-traumatic stress though without diagnosis or treatment from July 27, 2007, to November 2011. Hopefully with time and counseling, Mr. Breidenbach will heal; however, recovery under a negligent infliction of emotional distress claim is not available. Accordingly, Defendants are granted summary judgment on this claim.

**D.    Conclusion**

Mr. Levy's mental health issues and death are tragic. However, the conduct by law enforcement was reasonable under the circumstances and did not constitute excessive force nor negligent infliction of emotional distress. Therefore, Defendants are entitled to summary judgment on all claims. As a result, the Court need not provide Defendants with the opportunity to engage in the discovery resulting from Plaintiffs' late disclosures.

For the above-given reasons and those stated at the hearing, **IT IS HEREBY ORDERED**:

ORDER ~ 28

1.   Plaintiffs' Motion for Partial Summary Judgment, **ECF No. 48**, is **DENIED.**

2.   The City Defendants' Motion for Summary Judgment, **ECF No. 52**, is **GRANTED.**

3.   The City Defendants' Joint Motion to Strike Plaintiff's First Supplemental Disclosures, **ECF No. 54**, is **DENIED.**

4.   The County Defendants' Joint Motion for Summary Judgment, **ECF No. 60**, is **GRANTED.**

5.   The County Defendants' Joint Motion to Strike Declaration in Support of Motion, **ECF No. 79**, is **DENIED.**

6.   The City Defendants' Joint Motion to Strike Valadez Affidavit, **ECF No. 97**, is **DENIED.**

7.   **Judgment** is to be entered in Defendants' favor with prejudice.

8.   All hearing and deadlines are **STRICKEN.**

9.   This file shall be **CLOSED.**

**IT IS SO ORDERED.**  The District Court Executive is directed to enter this Order and to provide copies to counsel.

**DATED** this ___8th___ day of February 2012.


_____S/ Edward F. Shea_____
EDWARD F. SHEA
United States District Judge

Q:\Civil\2010\0233.msj.strike.lc1.wpd

ORDER ~ 29